Please all rise. Hear ye, hear ye, this Honorable Appellate Court of the 2nd Judicial District is now back in session. The Honorable Liam C. Brennan presiding. Please be seated. The Court of Final Case on today's document is 2-22-0148, Butler Brothers Supply Division, Appellant v. Appellant, v. HN Precision Company, Scott Newell, Dean Perron, and the leader of the industrial group, LLC, doing business as HN Precision, Mr. Brendan Appellant. Arguing for the Appellant, Mr. Robert J. Keech. Arguing for the Appellant v. HN Precision Company, Mr. Josh N. Antrose. Arguing for the Appellant v. Industrial Group, Mr. Peter G. Sergelis. Both sides ready to proceed? It pleases the Court, I am Robert J. Keech, counsel to Butler Brothers Supply Division, LLC, the Appellant in this appeal. The Illinois Supreme Court has consistently recognized the tort of promissory fraud where the plaintiff alleges a scheme to defraud and that the statements regarding future conduct are part of that scheme to defraud. Counsel, before you get too burned to your argument, if I could ask a threshold question. Sure. The order that was entered on April 27, 2022, or the order that was allegedly deemed to be final, dismissed the action without prejudice and referred the matter to arbitration. So what is our jurisdiction based on? Well, it also dismissed with prejudice the fraud claims against the remaining defendants. And in terms of the, and barred even as to the arbitration defendants, the cause of action for promissory fraud. What the lower court actually decided, interestingly enough, the circuit court did not judge the sufficiency of the pleadings. It did not look at whether or not we had properly pled the torts of promissory fraud, aiding and abetting, and receipt of the fruits of that fraud. What the circuit court held was that the mere presence of the contract barred those causes of action. That ruling is directly contrary to four separate opinions of the Illinois Supreme Court. And that statement was reversible error. That ruling was reversible error. That ruling led to the order that Your Honor has in front of you, which was we can proceed in breach of contract only against H.N. Precision and in arbitration because the contract had an arbitration clause. And we could not proceed at all against the remaining defendants because the ruling was with prejudice and barred the pursuit of the fraud claim. So the court held that the matter should have been referred to arbitration, correct? It didn't recognize the common law fraud counts and said you're going to arbitration. Is that what happened? What the court held was that essentially that the tort did not exist and that we were limited to a breach of contract claim. And if we were limited to a breach of contract claim, that claim was arbitrable. By the way. Only against H.N. Only against H.N., that's correct. The tort did not exist or the dispute was in connection with the contract. Well, those things are not mutually exclusive. You can actually be, it can be in connection with the contract and still be promissory fraud. In fact, the Illinois Supreme Court has said precisely that, as have multiple decisions of the United States District Court for the Northern District of Illinois and the Seventh Circuit. In other words, that you can have conduct that is a breach of contract, which also supports a tort of promissory fraud. The same allegations can support both. The fraud claim, however, has been ruled by all of those courts to be independent of the contract itself. What about the pleading requirement for promissory fraud? It's a heightened fact, the pleading requirement. Would that be fair? I think that certainly the Seventh Circuit and the U.S. District Courts have characterized it as such. I'm not sure the Illinois Supreme Court has actually agreed with that. I think in this case, I think it's probably not relevant because we clearly met however heightened the pleading requirement you want. So essentially, that pleading requirement has two elements. And I think as the Federal courts have explained it, this is an exception to the general prohibition against promissory fraud. And there's an understandable reluctance not to turn every breach of contract case into a tort case. And that's why the tort of promissory fraud is recognized by the Illinois Supreme Court as some reasonably identifiable and strict pleading requirements. First, you have to plead the basic elements of fraud, right, the five steps of pleading fraudulent misrepresentation. We did that clearly here. The essential pleading with respect to promissory fraud is that you also have to plead what's called the scheme. So what the Illinois Supreme Court has held, and as I said, in multiple opinions, the most prominent and most recent, I think, and most complete of which is HPI Healthcare, which, by the way, is on all fours with this case. What the court basically said was that a false statement or misrepresentation about future conduct is actionable as fraud if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud, right? So in other words, you have to say that the statements about future conduct, in this case promises to pay, statements that payments would be made if concessions were given, a month's, months as in plural, month's length repetition of lies to induce my client to ship goods. And what were the lies based on? Why were they lies? Because they clearly knew they had no ability to pay and no capacity to pay and that the buyer or the business had actually put in its contract that it was not going to pay. So your position, too, is that this behavior or this fraud can be inferred by the facts that were presented in the complaint? Correct. I mean, we both have direct factual allegations, the statements that were made, and the circumstances are inescapable that at the time they were made, the parties making them, one of whom was the senior officer of the corporation, knew that they were untrue. And a little context is useful here. The e-mail that we received, that my client received after the sale was already closed, indicated that the buyer here, which was buying pursuant to an Article IX secured party sale, renegotiated, had been negotiating for months. The terms of that purchase indicated that the buyer was not assuming any accounts payable. Right. That's standard, right? It's not not standard. What's different is, and I advise a lot of troubled companies, what's different is when you advise troubled companies who are buying goods, you advise them to stop buying goods when they can no longer afford to pay them. That didn't happen here. In fact, the seller, H.N., and its agents, its employees, and officers engaged in active concealment to make sure my client didn't know that it couldn't pay. In fact, they represented that they could. The reason for that had a lot to do with my client's specific relationship to this particular debtor. H.N. precision depended on my client for its continued operations. Your client had somebody in the business as well, correct? Physically present. We operate, in addition to their ability to spot or order things that we would ship to them, my client maintained what were called inventory locations or bins around what is a pretty sprawling manufacturing facility. So he was not aware of any of what was going on? No. He was not made aware of this? No. I mean, he was essentially a sort of inventory delivery person. And so what they would do, and some of this was critical tooling. In fact, the contract has a provision defining critical goods because they're the kinds of goods that we needed to keep on site because the failure to provide them would cause the factory to shut down, right? And so one of the reasons that they didn't tell us what was going on was that if we stopped shipping, they stopped operating, and now you're no longer selling a going concern. You're selling a business that's been shut down. The concealment, and we've pled this all in the complaint, the concealment extended to not giving us notice that was legally required that the secured party sale was going to take place. A very small part of my client's relationship with this debtor was that it consigned some goods to it, right? Like $50,000 of a totally much larger picture. My client filed a UCC financing statement on the consigned goods under the Uniform Commercial Code as it applies in Illinois and everywhere else. If you have a consignment statement on file, you must receive notice of a secured party sale. We didn't receive notice. The only notice we got was from the buyer after the sale had closed. Counsel, Ms. Carone is the materials manager for the company, as I understand. She was the materials manager for the seller, HN. She became employed by the buyer. One of the things that would have to occur in discovery is finding out when that second act occurred, but she clearly knew she was going to be employed by the buyer when she was making statements. So what specific actions did you allege in your complaint to establish that she was an active participant in the scheme to the fraud? Sure. She was actually the one involved in placing and approving what were called spot orders. We allege that. Secondly, she was the one who actively asked for extension of the payment terms with the specific representation that if we extended the payment terms, that we would get paid and that payments would return to normal terms. Well, if a company is having financial problems, would that be unusual to ask for some kind of relief on extension things? It's not unusual, but if you make an extension on the basis that you're going to pay in the future, when you know you cannot pay in the future, that's what makes this promissory fraud. How do we know that she knew they were not going to be able to pay in the future? She was involved, as we allege, she was directly involved in the negotiations for the sale and she admitted to employees of my client that she was aware of the sale before it occurred and the terms of the sale before it occurred and didn't say anything. I mean, you had a situation where there was a meeting where she was present the day before the sale where she was discussing future ordering from my client and a payment extension when the secured party sale occurred the next day, the terms of which mandated that my client not get paid. So, I mean, her promises actually and her continued concealment actually took place as late as the day before the actual sale. So she concealed what again? What did she conceal? She concealed that there was going to be a sale, right? If we had known there was going to be, I mean, a secured party sale is a foreclosure essentially, right? Had we known there was going to be a foreclosure sale involving our goods, we would have been able to conclude pretty quickly that we were not going to get paid and we would have stopped shipping. So the reason for the concealment was to keep us shipping. And that's why I said this is absolutely on all fours with HPI. HPI, which is the only Supreme Court case which coalesces this tort, involved representations by a hospital or a health care organization that they were going to pay for past due amounts owed for pharmaceutical goods and services. Those statements were made to keep the counterparty to that contract shipping pharmaceutical goods and services. Obviously, if a hospital doesn't have drugs and people to administer them, the hospital can't operate. And the hospital continued to tell that company time after time after time, you will get paid, you will get paid, we're seeking financing, we've got this going on, we've got that going on, but you will be paid. And the allegations in that case were that those statements were made with the full knowledge that the hospital did not have the ability to pay, nor did it have any prospect for payment. And the Illinois Supreme Court found that those allegations were sufficient to establish a scheme to defraud and to establish the tort of promissory fraud. That's exactly what we pled here. What happened below was simply a refusal to acknowledge that the tort exists. If this were an issue over pleading, we would have been given an opportunity to amend it. And the trial court said what? That established that it refused to recognize the tort even existed. The comment was essentially you have a contract, you have to sue and breach the contract. And we obviously argued both in our briefs below in an argument that we hadn't pled a contract claim. We specifically did not do so. We pled a claim for promissory tort, we pled a claim for aiding and abetting that tort, and as also recognized by the Illinois Supreme Court, we pled a claim against Premier for knowingly accepting the fruits of that fraud, which makes them liable as if they were participants under Illinois law. We never attempted to plead a breach of contract. So essentially forcing us to go forward only against H.N., only on breach of contract, and only via arbitration was to force us into a cause of action we did not plead nor seek to bring. What facts support Premier's knowledge of this fraud or scheme? Sure. Premier negotiated for this acquisition for months by their own admission. Well, I mean, any Article IX person would take some time. Sure. That same e-mail indicates they were aware that vendors were not being paid and that the bank was not being paid. So what does that have to do with anything? They had an agreement not to pay. Sure. Correct? Yeah, and I'll get to that. So a reasonable inference from the fact that you're negotiating for months to buy a going concern is that you would be aware of the financial condition of the concern and its operational condition. One of the conditions that Premier had in its sale was that this was a going concern. Well, if you're buying a going concern, you know that goods are being shipped, and particularly, again, the fact that we were present on site was evident to anybody who visits the site. The importance of my client evident to anybody who visits the site. And if you know that this going concern is going and that you know my client's providing goods and services, you know two other things. It's a reasonable inference that they knew, one, that H.N. had no capacity to pay because under the terms of the deal, the bank got all the money. No money was going to pay vendors. The terms of the deal were that vendors who shipped after the sale date, whose goods arrived after the sale date, would get paid. But all the rest of the money was going to the bank. H.N. knew that. It seems to me under this analysis there's an awful lot of people engaging in promissory fraud. Well, we think there are at least a buyer and a seller and the agents of the seller. I was going a little beyond this particular case. I mean, it seems to me that there's a lot of people purchasing going concerns, knowing that the whole point of this is because business is going under, right? Yeah, I can tell you this. I mean, honestly, as somebody who advises troubled companies all the time, it doesn't happen that way. We specifically advise clients that they're not to order goods when they don't have the capacity to pay for them because the individuals who are involved in the ordering are committing fraud, as is the company they work for. So it's not common at all for this to happen. What usually happens, honestly, is one of two things. Either they stop buying goods and they operate without the ability to replenish. That didn't happen here because of the essential nature of the goods. Or what happens, as should happen, because remember, offices of an insolvent company have a duty to their creditors as well as their shareholders, particularly when they're insolvent. What actually happens is you negotiate with the bank and the buyer to set aside money to pay for the goods that are shipped during the sale period. So in other words, you don't actually commit fraud against the vendors. You protect them. That didn't happen here. Mr. Cates, you will have an opportunity for Hawaii politics. One final rapid question. I was struck by your statement that you chose to proceed under a fraud theory, not under the contract, and that you have the contract, the arbitration clause, specifically says that it applies to any dispute arising in connection with the agreement and any associated purchase orders. So how did this not arise in connection with the agreement and the nonpayment of purchase orders? It was unconnected to the nonpayment of purchase orders? Yeah. Actually, the manned capital corp. Fast printing v. manned capital corp. case we cited addresses this issue directly. The promissory fraud claim that is supported by the scheme allegations has been found in that case to be completely independent of the contract. In that case, and I'll be very brief because I know my time, I've run over. In that case, what was at issue was whether or not a contractual limitations period applied, and that applied to any claim arising out of the contract. The court found that it did not because the same allegation and the argument made by the defendant there was, look, this was a breach of contract. Therefore, this limitation must apply. The court first found that the same allegation can support promissory fraud in a breach of contract and that if promissory fraud is pled, again, you have to plead the scheme. And as Justice Brennan indicated, those are specific pleading requirements which we have met here. But if you have a cause of action in promissory fraud, it's independent of the contract. And those limitations in the contract, including things like arbitration clauses, don't apply. Now, we're going to have to meet those requirements for proof as well, and it's a heightened proof requirement. We accept that challenge. We think we'll be able to prove that here. But we certainly pled it correctly, and we certainly pled in circumstances where the arbitration clause did not apply. Adjudicating our fraud claim is not going to require the court to look at one clause in the contract. It doesn't require interpretation of the contract at all. Unless you have further questions, I'll cede the podium. Thank you. Thank you. Good afternoon, Your Honors. I represent H.N. Precision, Scott Narrow, and Gene Perron. This case is really, really simple. I'm going to address the arbitration provision first. This, in the nature of their case, in their complaint, they say that this case is about placing orders with for which, with Butler, for which my clients had no intention to pay. The arbitration provision provides the parties shall strive to settle, and I'm paraphrasing, any dispute in connection with purchase orders. This case is all about nonpayment of purchase orders. It's easy. I mean, Judge Perron has nailed it. This case is about nonpayment of purchase orders. So he set the claims against regarding involving Butler Brothers and H.N. Precision to arbitration. That is easy. And they're going to have a chance in arbitration to go forward with whatever claims they want to go forward with. And it doesn't matter. Even the common law fraud and the aiding and abetting? They can't go forward with those claims in arbitration, can they? I don't know why not. I mean, the — Were they dismissed with prejudice? They were dismissed by the court. I'm sorry. The court did dismiss those claims with prejudice. And I'm going to address the aiding and abetting. But there is no reason that they can't move forward, at the very least, with a breach of contract claim regarding the purchase orders against my client. I mean, arbitration provisions are enforced. They're favored. And this one is clear. And whether we — Let's say they get a judgment. How do they get paid? Well, I mean, there — I mean, there's other plaintiffs and there's other — sorry, there's other defendants for the promissory fraud thing where maybe you could actually recover something. But as a practical matter, breach of contract with H.N., blood out of a stone. It's not happening. I don't know enough about how H.N. ended their business to know whether that is correct or not. Okay. But they should be held to the contract. Let me ask you — let me ask this question. Let's say an e-mail existed where you had discussions with, you know, I apologize, Gene Perron, Scott Nero, and they're e-mailing each other and they're talking about how this is great that Butler doesn't know that we're not going to pay them. Just clearly, point blank, yeah, it's all about purchase orders, but it makes clear that they're never going to pay them. They're doing it on purpose. They want to keep this business going. So that's — there's a scheme. You need all the elements. But because it relates to a purchase order, even there, would it be your position that it has to go to arbitration? Well, it would be our position that as far as the claims against H.N., it would have to go to arbitration. That is our position. That is what's — H.N., but in Justice Brennan's scenario, that would be Nero and Perron. Right. It would not have to go to arbitration as to them. And I want to address the scheme because that is critical here. I mean, we'll agree on something. The HPI case is an Illinois Supreme Court case and it controls here. Now, here, they don't — Butler doesn't allege not a single representation that we made. If you look at pages 8 and 9 of their reply brief where they try to summarize what these alleged false statements and representations were, there's not a single one in there. It's all about negotiating from 75 days to 90 days, merely a 15-day extension. Never does Gene Perron or Scott Nero or anybody say we are going to pay. It's all about we need additional time. So compare that to — Are there additional goods purchased as well, though? Scott, purchase orders or — Purchase orders were being made. And they know that they're not going to be paid because they know that Premier is about to not assume any debt and take control of the absence. Well, we would contest that, but I don't think that they have pled that with any form of specificity as required by the case law. And I want to compare what they have. And, again, I would recommend, because I just don't have time — Weren't Nero and Perron active participants in the purchase and buying these goods? And weren't they active participants in the corporation? Perron certainly was in the purchase. That's absolutely right. But let's compare the allegations on pages 8 and 9 of their reply where they try to overcome and show that there were representations to the HPI case. And I'm citing to the 131 Illinois 2nd, 145. The pinpoint site is pages 165, 166. This blows their case out of the water. In HPI, there were 11 separate representations regarding all sorts of representations where it was actually said, hey, we are going to pay. There were press releases. There were in-person communications. There were letters sent. There was a request for time to rebuild our cash and finances. There were statements that we're going to begin making payments and discussions about making a good faith payment. There were discussions of the implementation of a payment plan. There were allegations of secretly deciding to terminate the pharmaceutical agreement with HPI while at the same time negotiating a plan that was offering to pay a portion of the monies at issue. We don't have any of that here. And if you look at HPI, and, again, I don't have time, but there are 11 separate things, specific representations. Where are the representations here? They're not in the complaint. There's no representation by Gene Ferone, by Scott Nero, by anyone at HPI that we are going to pay. There are requests. It would be saying somebody went into a store and took something and walked out, but they never said, I'm stealing this. I mean, do they have to come right out and say, hey, we're not going to pay? Can't we infer, can't we make a reasonable inference that they had no intention of paying? I don't think so. I don't think based on the facts. Let me ask that question a little differently. Okay. I'm asking for an extension. I'm asking for an extension to pay. But at the same time, I'm asking for that extension to pay. I'm negotiating this Article 9 sale where it's clear you're not going to get paid. I am getting more than that. Why is that not an unfair? Why is that not a fair inference? Well, that's a lot different than counsel saying that this case is on all fours with HPI, which did not rely on inference. Okay. Let's assume it's not on all four. Is it on four with the spirit of HPI? And I would respectfully say it's not. If you look at HPI, there were just all the, there was all the specificity there. In the other cases that they cite, I could go on, there were specific representations that we're going to pay. There was none of that here. And, in fact, they kept requesting extensions and they were granted. So, and there was never anything in the complaint about, hey, pay up. They granted the extension if they knew about the Article 9 sale that the people asking for the extensions knew about? There was never a request for payment. There was never saying, hey, we're going to give you this extension, but you have to at least pay a portion of this down, like in the HPI case. But what difference does that make? They're still, they're still perpetrating a fraud, if you will, upon these people knowing they're not going to pay. What does it matter if they ask for payment at that time or not? How's that relevant? Well, this is, we have to keep in mind that the scheme requirement is an exception. It's an exception to the general rule that these kind of cases really are contract cases. And if you are going to try to plead promissory fraud, you have got to be specific and you've got to show a scheme. And in order to show a scheme, you have to have representations. There are no representations here. There is not a single one. They keep saying that there are representations, but if you look in the complaint, there are no representations. There are things that are alleged that Gene Peron and Scott Nero didn't say to them, but there is no misrepresentation. And if you don't have a single representation, I mean, there are cases that have held that one or two representations are not enough in order to proceed under promissory fraud. Here we don't have a single one. But don't you have the intent that they're behaviorally inducing, inducing Butler to act and inducing them to act upon some false statements, those statements being, oh, hey, can we have 50 days or can we have 90 days, which would infer, hey, we're going to pay, but we just need more time. Well, how is that not a statement making them, inducing them to continue this relationship? And again, well, we address the inducement, because I hear the bill, in our brief, but I'll say this. We're talking about a mere 15-day extension. This is not that big of a deal in terms of 15 days, deception. I mean, and this alleged meeting that they're making a big deal about with Peron took place literally the day before the sale was announced. How many extensions did they ask for? How many times? I don't know that off the top of my head. It's not one 15-day extension, is it? No. There were several. Several. Several requests for an extension. But my contention is, supported by the case law, is that that is not enough to come within this very strict scheme requirement and to show that there was any representation. Thank you. Thank you. Thank you. Justices, my name is Peter Sergelis. I represent Perdira. As the court has noted, my client purchased a business that was heading into foreclosure through an Article IX sale from the foreclosing lender, KNC. Under that type of asset purchase, all unsecured debts, like those held by Butler, are discharged. Obviously, the court noted that that's a fairly routine transaction. Butler's purported cause of action against my client is one for allegedly accepting the fruits of a common law fraud allegedly perpetuated by the other appellees. However, if there's no underlying fraud, there can be no cause of action against my client, and we adopt the arguments of our co-appellees. Should the court reverse this to the other appellees, and if Butler is to maintain its cause of action against my client, Butler will need to adequately plead and ultimately prove that my client accepted the benefit of the alleged fraud with either knowledge or willful ignorance of the fraud. The pleading requirement is subject, of course, to the higher pleading standard related to fraud. Accordingly, my client's alleged fraud, including the knowledge element, must be pled with specificity. Butler has not met that standard. Butler attempts to meet the pleading standard against my client's three primary things, Greg Wales' role at both Bentucs, which is the firm that created Premier for the Article IX purchase, and Premier, the timing of the creation of Premier, and the post-sale email from Greg Wales to Butler, which followed what appears to be an introductory call to Butler after consummation of the purchase of HM's assets. The first two things are, of course, perfectly legal and routine, and we cannot infer knowledge of the fraud from those facts. The email, the entirety of which is on page seven of our brief, is an acknowledgement, again, of an introductory call between the new ownership and Butler and the desire to engage Butler for services in the future. That email also provided notice of the sale dated March 24, 2021, which Butler contends it never received. At best, the only fair inference that can be drawn from that email is that Greg Wales learned of the alleged fraud on that phone call, and we cannot infer from that knowledge of the purported fraud prior to the sale. Butler's best case for the argument that it's adequately, excuse me, fled fraud against my client is the federal district court case, PulpFist. But even that case supports my client's dismissal. That case involved a detailed fraudulent scheme involving seniors in fraudulent mortgages obtained by defrauding home repair contractors. One of the claims was against banks that obtained assignments from mortgages and that allegedly willfully ignored the fraud because of irregularities in the mortgage paperwork. Well, your client was certainly aware via email, et cetera, of what was going on in the company, were they not? They were aware that it was a struggling company and that they were buying the assets through an article of exit.  With the bank. With the bank. They purchased the assets from the bank, right? It's a foreclosure. Right. What do you say about the suggestion that it's common in this circumstance where the company you're purchasing is continuing to operate to somehow address purchases like this that are ongoing to ensure that the seller is not being disadvantaged? You know, I don't know what H.N. should have done in that circumstance, but from my client's standpoint, I don't think it had any duty to contact Butler to disclose the purchase. Getting back to PulpFist, the federal district court there held that under the heightened pleading standards required for fraud in federal court, that's of course Rule 9, that the allegations against those banks were not enough to state a cause of action. My client is much closer to those banks than the other defendants in PulpFist which were kept in the case. The last fact that Butler relies on to adjudicate knowledge to my client is the fact that my client retained the services of certain employees of H.N. after the sale. But that doesn't substantiate knowledge of the fraud. First, the obvious, the employees were not agents of my client prior to the sale. And second, that's the business of the entity that created Premier, to buy failing businesses and turn them around. And the retention of employees is certainly not unusual. It was like a private equity situation, right? Yes, correct. I do want to address the jurisdictional question before I sit down. Although part of the complaint was dismissed without prejudice, it seems to me that the ruling disposed of the entire complaint as breach of contract wasn't flagged. So even though, you know, the words without prejudice were used and the magic words with prejudice for everything, I do think it disposed of the entire complaint. I don't see the necessity for three or four language to bestow jurisdiction. Thank you very much. Thank you, Your Honor. Mr. Keech. Thank you, Justice. This will be unnecessarily brief. Regarding the scheme requirement and pleading the scheme requirement. Who are you speaking of now, all three? Yeah, I'm speaking of all three, because the scheme requirement, I think, is essential to get past the hurdle in terms of promissory and fraud. The Oman's v. Manpower Inc. case we cited, which is a case in the United States District Court from the Northern District of Illinois, applying, obviously, the cases we've talked about, says the following about the scheme requirement. Although one fraudulent promise will ordinarily not suffice unless it is particularly egregious, Illinois courts have found as few as two broken promises to constitute the requisite scheme. Referring specifically to HPI and citing HPI, that court then says making one fraudulent promise repeatedly, including a promise of future payments, can also suffice, see HPI. HPI is not a case about 11 separate promises or different promises. HPI was a case, just like this case, about repeatedly making the same fraudulent promise. We will pay you when you didn't intend to pay. In terms of what did we allege as to specific misrepresentations, we alleged several. They're evident from the complaint, and they include, number one, ordering goods. When you order goods, you are promising to pay for them. So where is it specifically that you can prove that Premier knew all of this or was involved in the scheme? Sure. I could see, you know, you arguing that for Marin and Cron, who had their hands in this and were doing all of these things. Sure. What we know is that Premier was involved for months. We know that it was intimately involved in negotiating. Involved in negotiating. Negotiating to acquire a going concern, Your Honor. Right? A going concern is buying goods and services. Right? It wasn't like they were agreeing to buy a business that had shut down. That's a material difference here. So they said, okay, we don't take on the old debt. That's not our problem. You know, how do they know that Butler wasn't going to pay the old debt? The terms of the agreement that they executed with the bank require that all the money go to the bank. Right? Supposedly, I mean, I suppose they could have said, bank, are you going to pay all these unsecured creditors? Right. And certainly in discovery, that would be a fair question. Right? But in terms of the pleading requirement, if you're going to indulge in reasonable inferences about the facts we've alleged, we've alleged they were involved in intimate negotiations to buy a going concern. By the way, Ventu is not just any, as we've alleged, not just any private equity firm. They actually specialize in troubled businesses. They know the rules of this road as well as I do. Right? They knew these goods were not being paid for. They knew they were going to buy the inventory and that, therefore, they were going to be the beneficiaries of ill-gotten goods. And it is not at all typical to just let that happen when you're the buyer. I represent buyers, too. You take protections. You make sure you negotiate terms to make sure you're not doing that. You make the bank pay for it. Right? And that didn't happen here. Everybody was content to make sure that my client didn't know this. They concealed the sale from my client for one reason and one reason only. Because if we stopped providing tooling, the business would shut down and it would be worth a lot less to everybody else. And Narell and Perrin wouldn't have the jobs they were promised with the new company. That's that simple. Thank you, Your Honor. Thank you. Thank you very much to both sets of lawyers for spirited arguments. We will take the matter under advisement and issue an opinion in due course. Thank you very much.